IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

ALISON D'ANGELO,

      Plaintiff,

v.

WELLSTAR MEDICAL GROUP,
LLC and PAULINE BRIDGEMAN, *in
her individual capacity*,

      Defendants.

CIVIL ACTION FILE NO.

1:18-cv-3873-MHC-JKL

## <u>NON-FINAL REPORT AND RECOMMENDATION</u>

This is an employment discrimination case. Plaintiff Alison D'Angelo has filed an amended complaint raising claims pursuant to Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 1981, the Age Discrimination in Employment Act of 1967 ("ADEA"), and state law. [Doc. 17.] This matter is presently before the Court on Defendant WellStar Medical Group, LLC's ("WellStar") partial motion to dismiss and Defendant Pauline Bridgeman's motion to dismiss. [Docs. 18, 19.] The motions are ripe for review. For the following reasons, it is **RECOMMENDED** that WellStar's partial motion to dismiss be

**GRANTED IN PART AND DENIED IN PART** [Doc. 19] and that Bridgeman's motion to dismiss be **GRANTED** [Doc. 18].

## I.     PLAINTIFF'S AMENDED COMPLAINT

In her amended complaint, D'Angelo, who is white and 42 years old, alleges that she worked for Defendant WellStar as a Registered Medical Assistant at the East Cobb Medical Center from January 2005 to April 10, 2018, when she was forced to resign.  (Am. Compl. [Doc. 17] ¶ 12.)  D'Angelo's direct supervisor was Dr. Timothy Helton.  (*Id.* ¶ 13.)  Further up the chain of command, D'Angelo also reported to Defendant Bridgeman, who served as the Manager of the East Cobb Medical Center, and Christi Carmichael, the Director of Physician Operations.  (*Id.* ¶ 14.)   Bridgeman and Carmichael, who are African-American, had decisionmaking authority with respect to the hiring and firing of employees.  (*Id.* ¶¶ 14-15.)  Bridgeman reported to Carmichael.  (*Id.* ¶ 14.)

In early April 2018, WellStar began using a "temp agency" to staff Certified Medical Assistants ("CMAs") at the East Cobb Medical Center.  (Am. Compl. ¶ 17.)  Three CMAs, who were African-American and in their 20s, were assigned to work at the East Cobb Medical Center for 13 weeks.  (*Id.* ¶ 18.)  Bridgeman assigned one CMA, identified in the amended complaint only by her first name

2

Takesha, to train with D'Angelo.  (*Id.* ¶ 19.)  Bridgeman explained that she thought Takesha was a "problem-maker" with an "attitude" and assigned her to work with D'Angelo because she felt that D'Angelo "wouldn't take it with [Takesha]."  (*Id.* ¶ 20.)  D'Angelo alleges that Bridgeman and Carmichael assigned her to work with Takesha with the intent to cause a confrontation.  (*Id.* ¶ 45.)

On Takesha's first day of training, April 3, 2018, D'Angelo noticed Takesha using her cell phone to text and shop, even though the use of cell phones was prohibited.  (Am. Compl. ¶ 21.)  D'Angelo asked Takesha to put away her cell phone multiple times and eventually "lightly tapped Takesha on her arm to alert her, once again, to put her cell phone away."  (*Id.* ¶¶ 21-22.)  Takesha refused to put away her cell phone and told D'Angelo, "I don't know why it matters.  I'm only going to be here thirteen weeks."  (*Id.* ¶ 23.)  D'Angelo told Takesha that she had to follow the rules, and Takesha responded, "Well, then just report me if you have to."  (*Id.*)  Dr. Helton and two nurse practitioners (who are not African-American) were standing nearby during that exchange.  (*Id.* ¶ 22.)

On April 4, 2018, Takesha called in sick.  (Am. Compl. ¶ 24.)  On April 5, she did not show up to work or call to inform WellStar of her absence.  (*Id.*)  On April 6, Bridgeman called D'Angelo into her office and informed her that

Carmichael had received a formal complaint from Takesha.  (*Id.* ¶ 25.)  According to Takesha's complaint, D'Angelo "put her hands on Takesha" and told her that she would "snatch [her] out of her chair and kick her ass."  (*Id.*)  D'Angelo denied those allegations and informed Bridgeman and Carmichael that Dr. Helton and two nurse practitioners were present during her exchange with Takesha and could corroborate her version of events.  (*Id.* ¶ 26.)  D'Angelo also asked Bridgeman and Carmichael to call Takesha into the office so that D'Angelo could talk to her, and Carmichael refused, saying that she was not sure what "Takesha is going to do to [D'Angelo]."  (*Id.* ¶ 27.)

At about 4:30 in the afternoon on April 9, 2018, D'Angelo was informed that she must report to WellStar's corporate office at 9:00 the next morning instead of working her shift.  (Am. Compl. ¶¶ 28, 30.)  In her experience as a thirteen-year employee of WellStar, D'Angelo knew that WellStar was planning to fire her upon reporting to the corporate office.  (*Id.* ¶ 29.)  As a result, D'Angelo prepared a letter of resignation effective two weeks from April 9 and left it in Bridgeman's office at about 5:30, after Bridgeman had left for the day.  (*Id.* ¶ 32.)

D'Angelo reported to the corporate office the next morning and met with a WellStar human resources representative and Carmichael.  (Am. Compl. ¶ 33.)

4

They told D'Angelo that WellStar was "leaning toward" firing her but would give her two weeks' pay if she chose to resign immediately. (*Id.* ¶ 34.) D'Angelo again tried to explain what happened during her exchange with Takesha, but Carmichael and the human resources representative rebuffed her and said that "other African-American witnesses," whom they did not identify, had corroborated Takesha's version of events. (*Id.* ¶ 35.) Dr. Helton and the nurse practitioners who witnessed the exchange were not interviewed. (*Id.* ¶ 36.) D'Angelo mentioned the letter of resignation she had left in Bridgeman's office and was told that she could either be terminated immediately or resign immediately with two weeks' pay. (*Id.* ¶¶ 37-38.) D'Angelo resigned but ultimately was never given the two weeks' pay she was promised. (*Id.* ¶ 38.) Within one day of D'Angelo's termination, she had been replaced by one of the younger, African-American CMAs from the temp agency. (*Id.* ¶ 41.) D'Angelo also alleges that Bridgeman and Carmichael hired other younger, less qualified African-Americans after she resigned. (*Id.* ¶ 42.)

In Count One of her complaint, D'Angelo alleges that Defendants discriminated against her on the basis of race, in violation of Title VII and § 1981, by forcing her to resign based on unfounded allegations so they could replace her with a less qualified African-American employee. (Am. Compl. ¶¶ 44, 49-57.) In

Count Two, D'Angelo's alleges that WellStar discriminated against her on the basis of race when it forced her to resign and replaced her with a less-qualified younger employee.  (*Id.* ¶¶ 44, 59-63.)  In Count Three, a state law claim of negligent retention and supervision, D'Angelo asserts that WellStar knew or should have known that Bridgeman and Carmichael discriminated against her, that Bridgeman and Carmichael had a practice of hiring younger, less qualified African-American individuals, that Bridgeman and Carmichael had hired a person who they knew would behave inappropriately at the office, and that Bridgeman and Carmichael caused her to suffer severe emotional distress.  (*Id.* ¶¶ 65-69.)  In Count Four, D'Angelo alleges that WellStar breached its contract with her to give her two weeks' pay if she resigned.  (*Id.* ¶¶ 71-74.)  In Count Five, D'Angelo asserts that Defendants intentionally inflicted emotional distress on her by setting her up for a conflict with a difficulty employee, refusing to investigate the baseless complaint against her, and subjecting her to termination proceedings.  (*Id.* ¶¶ 76-79.)

## II.    THE PARTIES' ARGUMENTS

In its motion to dismiss, Defendant WellStar argues that D'Angelo has failed to state a claim of race or age discrimination because she has not alleged that she was subjected to an adverse employment action.  [Doc. 19 at 4-10.]  WellStar

6

argues that D'Angelo resigned voluntarily, notwithstanding her allegation that she was "forced" to resign.  [*Id.* at 5-7.]  Moreover, WellStar notes that D'Angelo has not attempted to allege facts that would support a constructive discharge and argues that her contention that she resigned because she knew she would be fired does not establish a constructive discharge.  [*Id.* at 7-10.]  As to D'Angelo's claim of negligent retention and supervision, WellStar argues that it is not based on a plausible underlying state law tort.  [*Id.* at 11-12.]  WellStar also argues that D'Angelo's allegations are insufficient to support a claim of intentional infliction of emotional distress.  [*Id.* at 12-14.]  WellStar does not seek the dismissal of Count Four, D'Angelo's breach of contract claim.  [*Id.* at 1 n.1.]

Bridgeman also has filed a motion to dismiss, in which she incorporates the arguments in WellStar's motion to dismiss that relate to her.  [Doc. 18 at 1-2.]  She also argues that D'Angelo has not plausibly alleged that she was involved in the termination proceedings against D'Angelo.  [*Id.* at 2-3.]  As to D'Angelo's claim of intentional infliction of emotional distress, Bridgeman argues that D'Angelo has not plausibly alleged that she personally inflicted any emotional distress on D'Angelo.  [*Id.* at 3-4.]

D'Angelo has responded to both motions to dismiss.  [Docs. 20, 21.]  She argues that she has adequately alleged an adverse employment action, in that she was actually discharged because she was forced to resign in lieu of termination or, alternatively, that she was constructively discharged.  [Doc. 20 at 8-20.]  She also argues that Defendants' conduct supports a claim of intentional infliction of emotional distress because they incited a confrontation between D'Angelo and Takesha, who submitted a fabricated complaint and "threatened physical violence." [*Id.* at 20-22; Doc. 21 at 11-14.]  Further, she argues that her claim of intentional infliction of emotional distress is an adequate underlying state law tort claim for purposes of her claim of negligent retention and supervision.  [Doc. 20 at 23-25.] As to Bridgeman's specific argument about the § 1981 claim, D'Angelo contends that Bridgeman was personally involved in the alleged racially discriminatory conduct because she had hiring and firing authority, paired D'Angelo with Takesha for training, and participated in a sham investigation into the exchange between D'Angelo and Takesha.  [Doc. 21 at 8-10.]

Defendants have filed reply briefs in support of their motions to dismiss. [Docs. 22, 23.]

## III. DISCUSSION

The Court begins its discussion by setting out the applicable legal standards governing a motion to dismiss.  The Court then addresses Defendant WellStar's argument about Counts One and Two—that D'Angelo has not alleged an adverse action for purposes of her discrimination claims.  Then, the Court addresses D'Angelo's § 1981 race discrimination claim as it relates to Defendant Bridgeman.  The Court next turns to D'Angelo's claim of intentional infliction of emotional distress.  Finally, the Court addresses her claim of negligent retention and supervision.

### A.    Motion to dismiss standard

In evaluating a Rule 12(b)(6) motion to dismiss, a court must determine whether the complaint contains "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  A complaint need not provide "detailed factual allegations," but it must provide factual allegations sufficient to set forth the plaintiff's entitlement to relief.  *Twombly*, 550 U.S. at 555.  Providing only "labels and conclusions" is insufficient, "and a formulaic recitation of the elements of a cause of action will not do."  *Id.*  The Court is not required to accept as true legal conclusions couched as factual

statements. *Iqbal*, 556 U.S. at 678. "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not [shown]—'that the pleader is entitled to relief.'" *Id.* at 679 (quoting Fed. R. Civ. P. 8(a)(2)).

A plaintiff in an employment discrimination case does not need to plead specific facts establishing a prima facie case of discrimination, as defined in *McDonnell Douglas*,[1] to survive a motion to dismiss. *Swierkiewicz v. Sorema N. A.*, 534 U.S. 506, 508, 514 (2002). Consistent with the general pleading standard, the complaint need not contain more allegations than necessary to make relief plausible and give the respondent fair notice of the grounds upon which the plaintiff's claims rest. *Id.* at 508, 514; *see also Evans v. Ga. Reg'l Hosp.*, 850 F.3d 1248, 1253 (11th Cir.), *cert. denied* 138 S. Ct. 557 (2017); *Surtain v. Hamlin Terrace Found.*, 789 F.3d 1239, 1246 (11th Cir. 2015). *Swierkiewicz*, however, does not obviate the requirements that a complaint give notice of the factual allegations that make a claim plausible and contain more than mere conclusory allegations. *Jackson v. BellSouth Telecomms.*, 372 F.3d 1250, 1270-71 (11th Cir. 2004).

---

[1] *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

**B.** **D'Angelo has alleged an adverse action for purposes of her discrimination claims against Defendant WellStar in Counts One and Two.**

In Count One, as it relates to Defendant WellStar, Plaintiff alleges that she was subjected to unlawful discrimination on the basis of race, in violation of Title VII and § 1981.  Title VII prohibits discrimination in employment based on race, among other protected characteristics.  42 U.S.C. § 2000e-2(a).  Section 1981 provides, in relevant part:

> All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full extent and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other. . . .  [T]he term "make and enforce contracts" includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship.

42 U.S.C. § 1981(a)-(b).  In the context of employment discrimination claims, § 1981 is a remedy parallel to Title VII, and the elements of a disparate treatment claim under § 1981 mirror those of a Title VII claim.  *Standard v. A.B.E.L. Servs., Inc.*, 161 F.3d 1318, 1330 (11th Cir. 1998).

In Count Two, Plaintiff also alleges she was subjected to unlawful discrimination on the basis of age.  The ADEA prohibits an employer from

11

discriminating against an employee who is at least forty years old on the basis of age.  29 U.S.C. §§ 623(a)(1), 631(a).

To prevail on either a race or age discrimination claim, an employee generally must establish, as her prima facie case, that he was a qualified member of a protected class and was subjected to an adverse employment action in contrast with similarly situated employees outside the protected class.  *See Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1325 (11th Cir. 2011) (Title VII and § 1981); *Jameson v. Arrow Co.*, 75 F.3d 1528, 1531 (11th Cir. 1996) (ADEA).  As stated above, at the pleading stage, a plaintiff need not allege specific facts establishing a prima facie case of discrimination, but she must set forth facts sufficient to meet the "plausibility" standard of *Iqbal* and *Twombly*.

The question at issue here is whether the allegations in the amended complaint, taken as true, establish that D'Angelo was subjected to an adverse employment action.  For a substantive discrimination claim, an adverse employment action means a "serious and material change in the terms, conditions, or privileges of employment."  *Davis v. Town of Lake Park*, 245 F.3d 1232, 1239 (11th Cir. 2001) (concluding that plaintiff failed to prove he was subjected to an adverse action for purposes of his claim under Title VII's anti-discrimination

12

clause).  Of course, termination is an adverse employment action.  Courts have held that forced or involuntary resignation is effectively a termination, and is therefore also an adverse employment action.  *Odom v. Citigroup Global Markets Inc.*, 62 F. Supp. 3d 1330, 1339-40 (N.D. Fla. 2014) (an employee's testimony that he was given a "resign or be fired" ultimatum created a triable issue of fact as to whether he was actually terminated).  Whether an employee who resigned was actually terminated turns on the employer's intent.  *See Thomas v. Dillard Dep't Stores, Inc.*, 116 F.3d 1432, 1434 (11th Cir. 1997).[2]  An actual discharge occurs when the employer uses language or engages in conduct that would logically lead a prudent person to believe she has been fired. *Id.*

---

[2] WellStar argues that *Thomas* is inapposite because the Court in *Thomas* determined that the employee was terminated when her employer offered her a demotion in lieu of termination.  [Doc. 23 at 5 n.2.]  The Court does not see how that factual difference matters with respect to the general principle that an inquiry into whether an employee was actually discharged turns on the employer's conduct and intent.  Courts also have applied *Thomas* to situations analogous to the instant case.  *See, e.g.*, *Odom*, 62 F. Supp. 3d at 1339; *Andazola v. Logan's Roadhouse Inc.*, 871 F. Supp. 2d 1186, 1208-09 (N.D. Ala. 2012).  Moreover, the parties cite cases involving forced resignation from public employment, *see Rodriguez v. Doral*, 863 F.3d 1343 (11th Cir. 2017), and *Hargray v. City of Hallandale*, 57 F.3d 1560 (11th Cir. 1995), but the Court is not aware of any controlling precedent applying those cases in the context of private employment.  *See also Odom*, 62 F. Supp. 3d at 1339 (declining to determine whether *Hargray* and its progeny apply to claims involving at-will employees in private employment).

Here, D'Angelo alleges she knew she was going to be fired when she was summoned to the corporate office based on her many years' employment with WellStar.  She attempted to resign before her termination meeting but, based on the allegations in the amended complaint, she was not able to communicate her intent to resign to Bridgeman before the meeting.[3]  Then, at the meeting, she was told that WellStar was "leaning toward" firing her but would allow her to resign with two weeks' pay and then was told more clearly that she could resign immediately or she would be fired immediately.  Based on that language, a prudent person could believe she was being fired but had the opportunity to take two weeks' pay if she resigned.  The fact that WellStar allegedly went back on its promise to give her two weeks' pay also tends to support the view that D'Angelo was actually fired at that meeting.   These factual allegations make a plausible showing, for pleading purposes, that D'Angelo was actually discharged.[4]

_____

[3] In any event, D'Angelo intended to resign effective two weeks from the date of the letter.  (Am. Compl. ¶ 32.)  She was discharged before that resignation date.

[4] D'Angelo raises arguments about constructive discharge, but in the Court's view, her claim as pleaded is more appropriately analyzed under an "actual discharge" theory.  *See Odom*, 62 F. Supp. 3d at 1339.  There are few allegations in the complaint that would support her theory that she was constructively discharged, as constructive discharge requires a showing that the terms of conditions of employment are so intolerable that a reasonable person would be

WellStar argues that D'Angelo's case is similar to a case from the District of Delaware, *Brogdon v. University of Delaware*, No. 13-1600-GMS, 2015 WL 167686 (D. Del. Jan 13, 2015). [Doc. 19 at 6-7.] In *Brogdon*, the plaintiff was a university employee who was told she would be laid off, but the university continued to find her temporary positions. *Brogdon*, 2015 WL 167686, at *1. The employee eventually resigned after a supervisor verbally abused her. *Id.* at *2. The court determined that plaintiff could not state a Title VII retaliation claim based on leaving her job because she voluntarily resigned. *Id.* at *4. *Brogdon* is not analogous to the present case, because D'Angelo has plausibly alleged that she was given an ultimatum to resign or be fired.

To be clear, the Court does not find that the amended complaint plausibly suggests that D'Angelo was "set up" by being paired with Takesha for training. Bridgeman told D'Angelo that working with Takesha would be difficult, but she felt D'Angelo was up to the challenge. In the amended complaint, D'Angelo only speculates that Bridgeman somehow knew that D'Angelo would have an altercation with Takesha and that Takesha would file a false complaint about the

---

compelled to resign. *Thomas*, 116 F.3d at 1433-34. D'Angelo does not allege she was offered continued employment in unsatisfactory conditions; she alleges she was offered a chance to resign with pay or be terminated.

15

altercation.  That speculation does not rise to the plausibility standard in *Iqbal* and *Twombly*.  Rather, the factual material in the amended complaint plausibly suggests that, after the incident with Takesha, Bridgeman and Carmichael conducted an investigation that was tainted by racial or ageist bias.  Thereafter, WellStar forced D'Angelo to resign or be fired based on the results of that investigation and replaced her with a younger, African-American employee.   Under those circumstances, D'Angelo has made a plausible showing that she was forced to resign and that her forced resignation was the product of a race- or age-based discriminatory motive.  The Court therefore concludes that Counts One and Two should be allowed to proceed as to Defendant WellStar

> **C.**   **For purposes of D'Angelo's § 1981 claim against Bridgeman, the amended complaint does not allege a plausible causal connection between Bridgeman's conduct and the adverse action.**

In Count One, in addition to her claim of race discrimination against Defendant WellStar, D'Angelo also asserts a § 1981 claim against Bridgeman individually.  Although there does not appear to be any controlling authority on this point, courts have required plaintiffs to demonstrate an "affirmative link" demonstrating a causal connection between an individual defendant and the discriminatory action in order to state a § 1981 claim against that individual

16

defendant. *Patterson v. Cty. of Oneida, N.Y.*, 375 F.3d 206, 229 (2d Cir. 2004); *see also Page v. Winn-Dixie Montgomery, Inc.*, 702 F. Supp. 2d 1334, 1355-56 (S.D. Ala. 2010); *Wallace v. DM Customs, Inc.*, No. 8:04-cv-115-T-23TBM, 2006 WL 2882715, at *7 (M.D. Fla. Oct. 6, 2006) (requiring the defendant's "personal involvement" in the discriminatory acts); *Ayers v. Intown Suites Mgmt., Inc.*, No. 1:05-cv-1528-JOF, 2006 WL 783352, at *3 (N.D. Ga. Mar. 21, 2006) (concluding that plaintiff failed to allege an individual defendant's personal involvement in her termination where the plaintiff alleged only that defendant encouraged managers to engage in discriminatory hiring and firing practices).  An individual may be liable for her direct participation in the alleged discriminatory act or for her knowledge of the discriminatory acts and failure to take corrective action upon receiving notice that constitutional violations have occurred.  *Patterson*, 375 F.3d at 229; *Wallace*, 2006 WL 2882715, at *7.

The Court agrees that, to state a § 1981 claim against an individual (or any defendant, for that matter), there must be a causal connection between the defendant's conduct and the adverse action suffered by the plaintiff.  Here, the factual material in the amended complaint does not establish Bridgeman's personal involvement in D'Angelo's forced resignation.  D'Angelo alleges that Bridgeman

17

had hiring and firing authority, but there is no indication in the amended complaint that she exercised that authority here.  D'Angelo attempted to resign by leaving a letter of resignation with Bridgeman, but Bridgeman apparently did not communicate the contents of the letter to Carmichael or the WellStar human resources representative who met with D'Angelo in her termination meeting. Furthermore, nothing in the amended complaint suggests that Bridgeman made the decision to begin termination proceedings against D'Angelo or even was aware of that decision.

Bridgeman's role in the investigation into Takesha's complaint also fails to establish Bridgeman's personal involvement in D'Angelo's forced resignation. Both Bridgeman and Carmichael were involved in the investigation and heard from D'Angelo about why the investigation was incomplete and had reached an inaccurate conclusion.  Specifically, Carmichael knew that Dr. Helton and the nurse practitioners were not interviewed for the investigation.  (*See* Am. Compl. ¶ 26.) Carmichael was also Bridgeman's supervisor.  Any causal connection between Bridgeman's part in the investigation and D'Angelo's forced resignation was severed by Carmichael's involvement in the investigation, Carmichael's knowledge that the investigation was flawed, and Carmichael's ultimate role as a

18

decisionmaker in forcing D'Angelo to resign.  Moreover, as stated above, there is no indication that Bridgeman knew about the termination proceedings or had an opportunity to prevent them.

For the foregoing reasons, the amended complaint does not establish a causal connection between Bridgeman's conduct and D'Angelo's alleged forced resignation.  The § 1981 claim should therefore be dismissed as to Bridgeman.

### D.    The claim of intentional infliction of emotional distress fails as a matter of law as to both Defendants.

A plaintiff asserting a claim of intentional infliction of emotional distress must show four elements: (1) intentional or reckless conduct, (2) that is extreme and outrageous and (3) causes emotional distress (4) that is severe.  *Mears v. Gulfstream Aerospace Corp.*, 225 Ga. App. 636, 638-39 (1997).  Extreme and outrageous conduct is "so serious as to *naturally* give rise to such intense feelings of humiliation, embarrassment, fright or extreme outrage as to cause severe emotional distress."  *United Parcel Service v. Moore*, 238 Ga. App. 376, 377 (1999) (quotation omitted).  A description of such conduct "would arouse [the] resentment [of an average member of the community] against the defendant so that she would exclaim 'Outrageous!'"  *Id.*

19

Here, none of the allegations in the amended complaint plausibly suggest that any Defendant engaged in extreme and outrageous conduct. For starters, Bridgeman's decision to assign D'Angelo to work with Takesha is not extreme and outrageous. Being required to work with difficult people is one of the "common vicissitudes of ordinary life" that does not constitute extreme or outrageous conduct. *See Jarrard v. United Parcel Serv., Inc.*, 242 Ga. App. 58, 62 (2000). Similarly, the investigation into D'Angelo's exchange with Takesha and D'Angelo's forced resignation—even if improperly motivated by racial or ageist bias—do not, without more, constitute extreme and outrageous conduct. *See Clark v. Coats & Clark, Inc.*, 990 F.2d 1217, 1229 (11th Cir. 1993) (noting that mere termination, even when motivated by an improper or discriminatory purpose, generally is not extreme and outrageous conduct); *Kogut v. L.L.J., Inc.*, No. 2:04-cv-149-WCO, 2005 WL 8156176, at *13 (N.D. Ga. July 29, 2005) (same).

D'Angelo argues that this case is similar to *S & W Seafoods Co. v. Jacor Broadcasting of Atlanta*, 194 Ga. App. 233 (1989), in which a radio talk show host made critical statements about a business and encouraged listeners to insult the manager, spit in his face, and punch him. [Doc. 20 at 21-22.] Specifically, D'Angelo argues that Carmichael's comment that she did not know what Takesha

20

would do to D'Angelo if called to a meeting with D'Angelo was a threat (by Takesha) of physical violence, causing D'Angelo to fear for her safety. [*Id.* at 22.] It is not clear to the Court that Carmichael was implying that Takesha might behave violently, but in any event, Carmichael kept Takesha and D'Angelo apart by not calling the meeting. That conduct can hardly be said to incite fear or violence, which was the conduct at issue in the *S & W Seafoods*.

D'Angelo also argues that this case is analogous to *Trimble v. Circuit City Stores, Inc.*, 220 Ga. App. 498 (1996), because Carmichael was D'Angelo's supervisor and the conduct in issue occurred at the workplace, where Defendants exercised control over D'Angelo. [Doc. 20 at 22.] In *Trimble*, the plaintiff was subjected to repeated, egregious sexual harassment in the workplace over a period of months; her employer refused to take any action, despite the plaintiff's numerous complaints; the plaintiff was forced to work an exhausting schedule and lift objects heavier than what was required by her job duties; the plaintiff was consistently punished for infractions outside of her control despite her otherwise excellent performance; and the employer doctored the plaintiff's sales figures and prevented her from making commission sales to retaliate against the plaintiff for filing a sexual harassment complaint. 220 Ga. App. at 498-99. The instant case is a far cry

21

from *Trimble*, as the conduct at issue in the amended complaint occurred over a period of days, not months, and did not involve egregious harassment on the part of a supervisor and a long-term campaign of retaliation on the part of management.

In sum, the Court concludes that D'Angelo has failed to show that Defendants engaged in conduct that was extreme and outrageous as a matter of law. Count Five should therefore be dismissed as to both Defendants.

> **E.     D'Angelo's claim of negligent hiring and retention fails because D'Angelo has not plausibly alleged an underlying tort.**

A claim for negligent retention or supervision arises when an employer negligently retains or supervises an employee and that employee subsequently harms the plaintiff. *Farrell v. Time Service, Inc.*, 178 F. Supp. 2d 1295, 1300 (N.D. Ga. 2001). The claim must be predicated on an underlying state law tort that forms the basis of the injury against the plaintiff; it cannot be predicated on federal employment discrimination claims. *Jones v. Nippon Cargo Airlines Co., Ltd.*, No. 1:17-cv-1589-TWT-JKL, 2018 WL 1077355, at *13 (N.D. Ga. Jan. 12, 2018).

Here, D'Angelo argues that her claim of negligent supervision and retention is based on her claim of intentional infliction of emotional distress. [Doc. 20 at 23-25.] The Court has determined that the amended complaint has failed to state a claim for intentional infliction of emotional distress. As such, the derivative

negligent retention and supervision claim also fails and should be dismissed.  *See Jones*, 2018 WL 1077355, at *13

## IV.   CONCLUSION

For the foregoing reasons, it is **RECOMMENDED** that WellStar's motion to dismiss be **GRANTED IN PART** and **DENIED IN PART**.  [Doc. 19.] Specifically, WellStar's motion should be granted as to Count III (negligent retention and supervision) and Count V (intentional infliction of emotional distress), but D'Angelo should be permitted to proceed with her case against WellStar on Count One (race discrimination), Count Two (age discrimination), and Count Four (breach of contract).   It is further **RECOMMENDED** that Bridgeman's motion to dismiss be **GRANTED**.  [Doc. 18.]

IT IS SO RECOMMENDED this 3rd day of May, 2019.

_____
JOHN K. LARKINS III
United States Magistrate Judge

23